IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.: 1:11cr35-SPM

TAVARIS LORENZO SCANES

_____/


## ORDER DENYING MOTION TO SUPPRESS

This cause comes before the Court on Defendant's Motion to Suppress (doc. 26) and the response in opposition filed by the Government (doc. 29).  At issue is the propriety of a traffic stop for dark window tint and the reasonableness of the duration of the stop. The Court held a hearing on May 14, 2012.  Upon careful consideration of the evidence and arguments presented, the motion will be denied.

1.     **BACKGROUND**

Defendant is a student at Tallahassee Community College.  On May 9, 2011, he was driving to Tallahassee, Florida, after going home to Miami on Mother's day.  He borrowed his brother's 2005 Chrysler 300 because his own car had transmission problems.  Around 8 or 9 p.m., Defendant picked up an acquaintance in Miami who needed a ride back to school.  He then headed to

Orlando to pick up his girlfriend, who also needed a ride.

At 3:18 a.m., Defendant was near mile marker 375 on I-75 north. His girlfriend, Amor Shachove, was asleep in the front passenger seat and his acquaintance, Leo Gilbert, was asleep in the backseat. According to Defendant, he saw a marked patrol car parked in the median and a bright light flashed to the side of his face as he passed. He later saw a car coming quickly from behind and recognized it as the patrol car as it got closer. The patrol car drove behind him then moved to the left lane and drove next to him a while. Then the car slipped behind him and the lights activated for Defendant to pull over.

Deputy Jeremy Eckdahl, who conducted the traffic stop, testified that he has worked for the Alachua County Sheriff's Office since 1997. He has conducted thousands of traffic stops during his career, including stops for dark window tint. Florida law prohibits dark window tint that lets in less than 28% of visible light through the driver's window and front passenger's window. Fla. Stat. § 316.2953. The windows behind the driver can be darker but must let in at least 15% of visible light. Fla. Stat. § 316.2954, Fla. Stat. "Every percentage measurement . . . is subject to a tolerance of plus or minus 3 percent." Fla. Stat. § 316.2955. Also, if the windshield has tinting or screening material, it must be confined to a strip at the top of the windshield, not to go below the "AS/1" portion of the windshield. Fla. Stat. § 316.2952(2)(b). Deputy Eckdahl testified that the AS/1 line is 4 inches down from the top of the windshield.

CASE NO.: 1:11cr35-SPM

According to Deputy Eckdahl, when checking a vehicle's window tint at night, he will pull along side of the vehicle. As it goes by a billboard or some other source of backlighting, he will try to see inside the vehicle. If he cannot see anything inside, even silhouettes, he will stop the vehicle and check the tint. Deputy Eckdahl testified that he drove behind Defendant's vehicle and could not see through the back glass. He then pulled up to the side and tried to get backlighting. He could not see through the side windows at all. Deputy Eckdahl also testified that the tint on the windshield looked like it went below the AS/1 line.[1] Deputy Eckdahl backed off and got behind Defendant and activated the lights on his patrol car to stop Defendant's vehicle to check the tint. Defendant pulled over to the side of the road.

Both Deputy Eckdahl and Defendant testified that Deputy Eckdahl used his loud speaker to ask Defendant to step out of the vehicle and come to the patrol car. Leo Gilbert testified that he woke up when he felt the vehicle pulling over to the side of the road. Amor Shachove testified that she woke up when Defendant got out of the vehicle.

---

[1]    Deputy Eckdahl did not explain how he was able to see the front windshield of the vehicle before the traffic stop. It is possible that Deputy Eckdahl saw the windshield as the vehicle passed him initially or by pulling ahead of the vehicle when he was checking the other windows. But Deputy Eckdahl did not testify about this matter. It is also possible that Deputy Eckdahl noticed the AS/1 violation only after the stop. Given the uncertainty, the AS/1 violation will not be considered as part of the probable cause to stop the vehicle.

There are some discrepancies among the witnesses as to exactly what happened next, but none of the discrepancies are material to the issue of probable cause or the duration of the stop. Deputy Eckdahl testified that he met Defendant at the front of the patrol car and explained to Defendant that the tint appeared to be too dark on the vehicle. He asked Defendant whether there were any occupants in the vehicle.

In contrast, Defendant testified that he walked to the driver's door of the patrol car first and gave Deputy Eckdahl his license. Defendant testified that Deputy Eckdahl checked his license and asked him a question about a concealed weapons permit that Defendant had applied for. He asked Defendant about the occupants. He then instructed Defendant to go to the front of the patrol car. Defendant testified that Deputy Eckdahl did not mention the window tint to him.

At the front of the patrol car, Deputy Eckdahl left Defendant and went to the passenger side of the vehicle to speak to the occupants. According to Deputy Eckdahl, he spoke to Gilbert first and then to Shachove. Gilbert and Shachove, however, testified that Deputy Eckdahl spoke to Shachove first and then to Gilbert.

Deputy Eckdahl testified that he checked the window tint on the front and rear doors on the passenger side of the vehicle. The window at the rear door tested at 14% visible light transmission, which is within the legal tolerance for

rear window tint.  The window at the front passenger door also tested at 14%,

putting it below the 28% visible light transmission required for front windows.

Shachove testified that she did not see Deputy Eckdahl test the tint.  Gilbert

testified that he expected Deputy Eckdahl to test the tint and leave, but he did not

recall whether or not Deputy Eckdahl tested the tint.

Gilbert testified that Deputy Eckdahl asked him why he was sweating.

Gilbert explained to him that he was sweating because he had just woken up.  In

court, Gilbert explained that he tends to get hot while sleeping because he has

long, thick hair.  Shachove testified that she did not notice Gilbert sweating.

Deputy Eckdahl testified that as he was checking the tint he noticed

Gilbert was sweating.  Deputy Eckdahl further testified that Gilbert was not

making eye-contact with him.  Deputy Eckdahl testified that he suspected

criminal activity, so using his handheld radio while standing by the windows,

taking no more than a few seconds' time, he called for a K-9 unit for back up.

Deputy Eckdahl then returned to speak to Defendant at the front of the patrol car.

Deputy Eckdahl testified that he retrieved his notepad to write a citation for

dark tint.  He inspected Defendant's license and registration and asked

Defendant about his destination.  According to Deputy Eckdahl, Defendant

began to get nervous and was visibly shaking.  The dispatch report shows that K-

9 Deputy Lloyd O'Quinn arrived at the scene at 3:25 a.m., which is just 7 minutes

into the stop.  Deputy Eckdahl testified that he spoke briefly with Deputy O'Quinn

to let him know what was going on.  In accordance with standard procedure,
Deputy Eckdahl had Shachove and Gilbert leave the vehicle while Deputy
O'Quinn took his narcotics dog around the vehicle.  Deputy O'Quinn testified that
Shachove and Gilbert were outside of the vehicle when he took his dog around it.

Defendant's testimony differs slightly.  According to Defendant, Deputy
Eckdahl came back and told him that "everything looks fine."  Defendant does not
remember if Deputy Eckdahl said anything about the tint, but he testified that
Deputy Eckdahl asked him "What's wrong with your friend?  He's sweating.  I
think you need to get him to the hospital."  Defendant testified that another officer
with a dog arrived at the scene and took the dog around the vehicle while
Shachove and Gilbert were still inside the vehicle.  Deputy Eckdahl then advised
Defendant that the dog alerted and he had Shachove and Gilbert leave the
vehicle. Shachove testified that she saw the K-9 unit vehicle, but she did not see
the dog.  Shachove testified that when she left the vehicle, she saw two officers.
Gilbert also testified that there were multiple officers when he left the car, but he
was not asked, and he did not state, whether or not he saw the dog.

Whatever the sequence, Deputy O'Quinn took his dog around the vehicle
within a minute or two of his arrival.  The dog alerted.  In accordance with
standard procedure, Deputy Eckdahl placed Defendant, Shachove, and Gilbert in
the back of a patrol car.  Deputy Eckdahl's supervisor, Sergeant Brett Rowlands,
arrived at the scene at 3:30 a.m.  Together the three officers searched the

vehicle.  In the trunk, Deputy Eckdahl found a black bag that had clothing and a

DVD player.  Deputy Eckdahl testified that the DVD player felt heavy.  He turned

it over and shined his flashlight into the vent holes on the bottom.  Inside he saw

duct tape.  Deputy Eckdahl took the DVD player to the front of the vehicle.

Sergeant Rowlands used a screwdriver to remove the cover of the DVD player.

Inside, they found a foodsaver bag and a smaller duct-taped package.  The

contents of the foodsaver bag contained one kilogram of a white powder that

tested positive for cocaine.  The smaller duct-taped package contained 43 grams

of Oxycodone pills.  Defendant, Shachove, and Gilbert were arrested, placed in

handcuffs, and transported to the Alachua County Sherriff's Office.

Aside from the testimony of these witnesses concerning the traffic stop,

two other matters were discussed at the hearing.  First, the video recording of the

incident taken from Deputy Eckdahl's patrol car: it was not saved.  It is unlikely

that the video would have been probative of the issue of probable cause for the

traffic stop, since the video would not have shown Deputy Eckdahl's view of the

window tint from driving along side of the vehicle.  On the other hand, the video

would have shown the sequence of events that took place, which was subject to

differing testimony from the witnesses.  The differences, however, related to non-

material details and the witnesses were consistent as to the material facts and

what generally happened during the stop.

On cross examination, Deputy Eckdahl testified that he failed to properly

save the video. He was reprimanded for his failure. After the hearing, Defendant

made a proffer of the 20-page administrative investigation report concerning the

missing recording. Doc. 41. The Court has reviewed the report and finds that

the bulk of the information in the report concerns matters extrinsic to this case

and irrelevant to the issues in dispute. To the extent the report does contain

relevant information, it is cumulative of Deputy Eckdahl's testimony that he failed

to save the video and was reprimanded.

The second matter discussed at the hearing was the vehicle. Defendant's

brother, Terry Scanes, Jr., testified he bought the 2005 Chrysler 300 at an

auction in 2008 for $5,000.00. He kept the car at his father's house and allowed

other people to use it as needed, including his brother, mother, father, cousins,

and girlfriend. Defendant's brother testified that in February of 2012, after the

indictment was issued in this case, he was in an accident while driving the

vehicle. He had another accident at the end of February 2012 or the beginning

of March 2012, in which the entire passenger side of the vehicle was smashed in

a hit and run accident. Defendant's brother stated that he received, but did not

bring with him, a copy of the traffic report from the later accident.[2]

Defendant's brother testified that the vehicle was totaled and sold for

---

[2] A traffic report of the earlier accident was presented to Defendant's brother, who clarified that it was the later accident that resulted in the destruction of the vehicle.

parts.  He was able to save the driver's side front door, including the window.

The door was brought into the courtroom and the tint on the window was plainly

visible, but it was not so dark that one could not see through the window.  A

separate witness tested the window in the courtroom using a tint meter.  The

result showed that the window allowed in 31.9% of visible light, which is above

the legal minimum of 28% visible light transmission.

Although the driver's side front window is not one that Deputy Eckdahl

tested (he testified that he tested the front and rear passenger side windows,

both tested at 14%), Deputy Eckdahl testified that in determining whether there

was probable cause to stop the vehicle, he drove along side of the vehicle and

tried to look through the windows when there was back lighting.  Defendant

testified that Deputy Eckdahl drove along to the left of him and lingered there.  So

the evidence suggests that Deputy Eckdahl tried to look through the driver's side

front window and pulled Defendant over because he could not see through it,

thus making that window relevant to the issue of probable cause.

Though relevant, the Court cannot give much evidentiary weight to the

window.  Looking at Defendant's brother's testimony, the vehicle has had at least

two accidents.  The traffic report from the latest accident was not presented.

Defendant's brother testified that he kept the receipt from when he had the

windows tinted in 2009 or 2010.  The receipt, admitted as Defendant's exhibit C,

is dated June 27, 2010 from Chachy's Auto Tint Sound & Security in Miami,

Florida.  There is very little information on the receipt, although it does include

"05 Chyrsle[r] 300" and "35% R" and "$65."  The receipt indicates that the job

was sold by "LWS" and there is a check mark next to the payment box for cash.

Defendant's brother testified that he did not have the tint removed or fixed, even

though he was aware that Defendant had been stopped for dark tint.  He testified

that he believed the tint was fine, and that he had never been stopped.

It is not clear how often Defendant's brother actually uses the vehicle.

Defendant's brother testified that the vehicle sat at his father's house and that

others had access and permission to use it.  In fact, when Defendant borrowed

the vehicle, although he did not intend to return it until the following week, he felt

no need to ask for his brother's permission beforehand.  So even if Defendant's

brother's testimony is credited as true, it still is not clear what else happened to

the vehicle in the past year.  The window in the driver's side front door as

presented in the courtroom is not a reliable indicator of what the window looked

like at the time of the stop.

**2.      DISCUSSION**

**A.  Probable Cause**

To stop a moving vehicle for a traffic violation, an officer must have

probable cause to believe that a traffic violation has occurred.  <u>United States v.</u>

<u>Weaver</u>, 145 F. App'x 639, 641 (11th Cir. 2005).  Probable cause is judged using

the standard of an objectively reasonable officer.  <u>Id.</u>  The officer must have

more than a mere suspicion that a traffic violation has occurred; but absolute certainty is not required.  Id.  The touchstone is whether a reasonable officer under the circumstance would find a fair probability that a traffic violation has occurred.  Id. at 642; United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *2 (M.D. Fla. Nov. 17, 2010).

Defendant argues that it was unreasonable for Deputy Eckdahl to believe that the tint on his windows was too dark given the time of night, the condition of the tint, and the speed at which Defendant was traveling.  The Court finds, however, that Deputy Eckdahl had probable cause to stop the vehicle for illegal tint.  Deputy Eckdahl testified that when he checks window tint at night, he drives along side the vehicle and examines the tint in an area where there is some type of backlighting.  If he cannot see inside the vehicle at all, he will stop the vehicle to check the tint.  The Court finds that Deputy Eckdahl's testimony is credible. His technique and standard for checking window tint at night is objectively reasonable.  See Weaver, at *1 (driving along side of vehicle at night to look for silhouette and dashboard lights to check tint); Alvardo, at *3 (driving along side of vehicle at night on well-lit street to check tint); Vasquez v. United States, No. 2:07-CV-123-FtM-33DNF, 2007 WL 2936263, at *3 (M.D. Fla. Oct. 9, 2007) (inability to see silhouette through window at night establishes probable cause for tint infraction).

Despite the darkness, Deputy Eckdahl had a reasonable opportunity to

view the light transmittance of Defendant's windows using available backlighting.
Driving along side the vehicle reduced the speed of Defendant's vehicle relative
to Deputy Eckdahl and gave Deputy Eckdahl reasonable time to look at the
windows. Finally, Deputy Eckdahl testified that he could not see through the
windows at all, which is a reasonable indication that the tint was too dark. The
Court credits all of this testimony as true and finds that Deputy Eckdahl had
probable cause to stop Defendant's vehicle for illegal tint.

### B.     Duration of the Stop

A stop for a traffic violation is limited to the time necessary to process the
violation unless there is reasonable suspicion of other criminal activity. United
States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003). In processing a violation,
an officer may request a computer check of the driver's license and vehicle
registration. Id. The officer may also make a criminal history check if that is part
of the officer's routine traffic investigation. Id. at 1107.

In this case, Deputy Eckdahl testified that he was still processing the
window tint violation when Deputy O'Quinn arrived with the drug dog. Deputy
Eckdahl's testimony is credible. The dispatch report shows that Deputy O'Quinn
arrived at the scene at 3:25 a.m., which is just 7 minutes into the stop. During
this time, Deputy Eckdahl had Defendant leave the vehicle, explained to
Defendant the reason for the stop, asked about the occupants, talked to both
occupants, tested the tint on two windows, began processing Defendant's

citation, and called in a check of Defendant's license, registration, and criminal history.

All of the actions during the stop occurred within an impressively short period of time. Although there are no "rigid time limitations" for assessing whether the duration of a stop is reasonable, <u>United States v. Purcell</u>, 236 F.3d 1274, 1278 (11th Cir. 2001), here less than 10 minutes passed before the narcotics dog alerted on Defendant's vehicle. Deputy Eckdahl did not prolong the stop to wait for Deputy O'Quinn to arrive. The alert by the narcotics dog occurred while the initial traffic stop was still pending. The duration of the stop was reasonable.

###    3.    CONCLUSION

Despite minor discrepancies in the eye-witness testimony concerning the traffic stop, the testimony was consistent with regard to the material circumstances of the stop. The testimony shows that Deputy Eckdahl made a reasonable effort to check the vehicle's window tint using recognized procedures for doing so at night. Deputy Eckdahl could not see anything through the windows, even silhouettes, giving him probable cause to stop Defendant's vehicle for a tint violation.

The duration of the stop was reasonable. From the beginning of the stop until the time the narcotics dog alerted, less than 10 minutes passed. During this time, Deputy Eckdahl was investigating the tint violation. He did not prolong the

stop to investigate other matters.  Based on the foregoing, it is

ORDERED AND ADJUDGED: Defendant's Motion to Suppress (doc. 26)

is denied.

DONE AND ORDERED this 21st day of May, 2012.


*s/ Stephan P. Mickle*
Stephan P. Mickle
Senior United States District Judge